Defendant-appellant, Carl M. Osborne, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of attempted murder, in violation of R.C. 2923.02
and 2903.02; one count of felonious assault, in violation of R.C. 2903.11; and one count of aggravated robbery, in violation of R.C. 2911.01.
The evidence presented at defendant's trial revealed the following: On October 1, 1997, defendant was living at 61 North Princeton Avenue in Columbus, Ohio, in half a duplex which he shared with Steve Kindred and Jamie Pyle. Kindred was responsible for paying the rent for the apartment, and defendant and Pyle in turn paid Kindred to live there. Defendant had been living at the Princeton Avenue address for about two weeks, and had agreed to pay Kindred rent of $150 per month. As of October 1, 1997, defendant had paid Kindred for his first two weeks rent, and had paid him $80 of the $150 he owed for October.
October 1, 1997, was Kindred's birthday and he, Pyle and defendant planned to go drinking after work that evening to celebrate the occasion. When defendant arrived home from his job as a construction worker around 4:00 p.m., Pyle was already there but Kindred had not yet arrived home. Defendant showered and changed clothes while he and Pyle waited for Kindred to get home from work. When Kindred still had not gotten home by 6:00 p.m., defendant and Pyle decided to walk to Kelly's, a nearby bar, to shoot pool without Kindred.
Pyle and defendant arrived at Kelly's around 6:30 p.m., and began shooting pool and drinking beer. They continued to shoot pool and drink until shortly after 2:00 a.m., when Kelly's closed. Defendant testified that he had approximately twenty beers and two shots of tequila at Kelly's. Defendant also stated that he purchased a six pack of beer at the bar to drink on the walk home; however, Pyle testified that defendant consumed about ten beers while they were playing pool, and made no mention of defendant drinking tequila or of defendant drinking after they left Kelly's. After leaving Kelly's, defendant and Pyle walked five or six blocks to a White Castle restaurant to get something to eat, and then walked home. According to Pyle, defendant did not appear to be drunk during the walk home.
Meanwhile, Kindred, who had gotten off work between 4:00 and 5:00 p.m., had gone to a bar on Sullivant Avenue with a co-worker who had offered to buy him a beer for his birthday. After drinking three or four beers, Kindred decided to go home because he had to get up for work early the following morning. After leaving the bar, Kindred gave his co-worker a ride home and then drove himself home. Kindred arrived home around 7:00 p.m. Since defendant and Pyle had left by this time, Kindred laid down on the couch in the living room and turned on the television.
Sometime after 2:30 a.m., defendant and Pyle arrived home. Kindred, who had fallen asleep on the couch, was awakened by their return. The three talked briefly, and Kindred reminded defendant that he still owed $70 on his October rent. Shortly thereafter, defendant and Pyle went upstairs to their separate bedrooms. Kindred stayed on the couch, where he was sleeping while his bedroom was being remodeled.
According to Pyle, shortly after he and defendant went upstairs, defendant stopped in Pyle's room and asked him if he would wake him up at 5:00 a.m. Pyle agreed to do so. About five minutes later, defendant returned to Pyle's room and retrieved a claw hammer which he had loaned to Pyle several days earlier. Pyle then heard defendant go downstairs. Thereafter, everything was quiet for five or ten minutes. Pyle then heard a loud noise downstairs like a lamp being knocked over. This was followed by Kindred screaming, "Carl, stop. You're killing me." Pyle immediately got out of bed and went into the hallway. He then heard what he described as a scuffle or "wrestling noise" coming from the living room. At this point, Pyle got scared and ran into Kindred's empty bedroom and shut the door behind him. He then climbed out the bedroom window onto the roof. As Pyle climbed out the window, he heard defendant run up the stairs; Pyle then jumped to the roof of an adjacent house which was vacant, and climbed through a window into the house. As Pyle was making his way to the first floor of the vacant house, he heard defendant outside walking between the two buildings. Pyle stopped by a window and watched defendant walk from between the buildings toward the street, enter Kindred's Ford Escort and drive away.
After defendant drove away, Pyle went in search of help. Because Pyle knew that Columbus Police Detective William Wolfert lived in the other half of his duplex, he went there and began pounding on the front door. Detective Wolfert testified that, in the early morning hours of October 2, 1997, he heard a single argumentative voice coming from Kindred's apartment. The voice lasted about twenty seconds, but was followed by the sound of someone going up the steps and then back down the steps in Kindred's apartment. Things were then silent for several minutes. Detective Wolfert then heard what he believed to be the front door to Kindred's apartment slam, followed seconds later by the sound of a car being started and driven away. Several minutes later, Detective Wolfert heard someone pounding at his front door.
When Detective Wolfert answered the front door, Pyle told him that Kindred had been badly hurt. Detective Wolfert immediately tried to enter Kindred's apartment, but was unable to do so because both the front and back doors were locked, and Pyle did not have his key with him. When detective Wolfert looked into the darkened house through a window he was able to see the shadow of a person moving around in the living room. He then procured a flashlight from his apartment and shined it through the front window of Kindred's apartment. Upon doing so, Detective Wolfert could see that Kindred was now lying on the couch, and appeared to be covered in blood. Detective Wolfert immediately ran back to his apartment and called 911 and asked for the police and a rescue squad to be sent to 61 Princeton Avenue.
Columbus Police Officers Raymond Clouse and his partner Officer Larry Geis arrived at 61 Princeton Avenue in response to Detective Wolfert's 911 call, at approximately 5:00 a.m. The officers banged on the door in an attempt to get Kindred to open the door. After several minutes, Kindred managed to open the door. Upon seeing Kindred's bloody and bewildered condition, the officers helped him back to the couch. Kindred was transported to the hospital by rescue squad shortly thereafter.
Kindred remained in the hospital for several weeks following the attack. He sustained a broken jaw, multiple skull fractures and permanent brain damage in the attack. He has no memory of any of the events which led to his injuries. Kindred testified that the last thing he remembers prior to waking up in the hospital in late October 1997, is laying down on the couch in his apartment around 7:00 p.m., on the night of October 1, 1997.
Defendant testified that he had no memory of anything that happened from the time he went up to bed until he woke up around 6:00 a.m., on the morning of October 2, 1997, sitting in Kindred's Ford Escort on the south side of Columbus. When he awoke, he was covered in blood from his waist to his knees, with a bloody hammer sitting in his lap. After ascertaining that the blood was not his own, defendant surmised that he must have hurt someone badly. Not knowing what he had done, or what to do, and in a state of panic, defendant threw the hammer into some nearby bushes and abandoned the car, taking the keys with him so that the car would not be stolen. According to defendant, he then wandered around the south end of town trying to figure out what he should do. Sometime after 5:00 p.m., that afternoon, he succeeded in contacting his sister by telephone. She told him that she had seen his picture on the news and believed that he was wanted for killing the man from whom he rented his room. Shortly thereafter, defendant flagged down a police cruiser and turned himself in. Defendant later directed the police to the hammer and told them where they could find Kindred's car.
Beginning on March 11, 1998, a jury trial was commenced against defendant on one count of attempted murder, one count of felonious assault, one count of aggravated robbery, and one count of theft arising out of the events at 61 Princeton Avenue during the early morning hours of October 2, 1997. At the close of the state's case, the court dismissed the theft count at the state's request. On March 16, 1998, the jury found defendant guilty of attempted murder, felonious assault and aggravated robbery. The felonious assault and attempted murder convictions were merged, and the state elected to have defendant sentenced for attempted murder. Subsequently, the trial court sentenced defendant to consecutive terms of ten years for the attempted murder and eight years for the aggravated robbery, and ordered defendant to pay restitution in the amount of $50,000. Defendant appeals from his convictions and sentence, assigning the following errors:
FIRST ASSIGNMENT OF ERROR:
 The verdict of the jury was against the manifest weight of the evidence.
SECOND ASSIGNMENT OF ERROR:
 There was insufficient evidence to establish that Appellant attempted to cause the death of Steven Kindred.
THIRD ASSIGNMENT OF ERROR:
 The trial court abused its discretion in setting a random figure for restitution.
Defendant's first and second assignments of error are interrelated and will be dealt with together. In his first assignment of error, defendant argues that both his attempted murder conviction and his aggravated robbery conviction are against the manifest weight of the evidence. In his second assignment of error, defendant argues that his attempted murder conviction is against the sufficiency of the evidence.
It is now settled that challenges to the sufficiency of the evidence and the manifest weight of the evidence are analytically distinct. State v. Thompkins (1997), 78 Ohio St.3d 380,386. We will begin by addressing defendant's sufficiency challenge to his attempted murder conviction. In reviewing a claim that a criminal conviction is against the sufficiency of the evidence, an appellate court must determine whether the evidence presented at trial and viewed in a light most favorable to the prosecution would allow a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law.Thompkins, supra.
In order to convict defendant of attempted murder, pursuant to R.C. 2923.02[1] and 2903.02[2], the state was required to establish that defendant purposely engaged in conduct which, if successful, would have caused another's death. State v. Kidder
(1987), 32 Ohio St.3d 279, 283. In challenging his attempted murder conviction on sufficiency grounds, defendant does not argue that the state failed to show that it was he who attacked Kindred with a hammer. Rather, defendant argues that the state failed to present any evidence from which a jury could reasonably find that, in so doing, he purposely sought to cause Kindred's death.
It is true that the state presented no direct evidence that defendant intended to kill Kindred when he attacked him; however, a jury may infer a purpose to kill from the circumstances surrounding a violent crime, including the nature of the weapon used and the manner of its use. State v. Morgan
(Nov. 17, 1987), Franklin App. No. 86AP-854, unreported (1987 Opinions 2782); State v. Cook (Dec. 19, 1997), Hamilton App. No. C-960252, unreported (jury permitted to enter intent to kill from circumstances including the use of a stonemason's hammer to strike the victim). Such an inference is proper where the victim's death was a natural and probable consequence of a defendant's conduct. State v. Edwards (1985), 26 Ohio App.3d 199,200. Here, there was ample evidence to show that defendant repeatedly struck Kindred in the head with a claw hammer with sufficient force to cause multiple skull fractures. Although Kindred was fortunate enough to survive defendant's attack, given the nature and severity of the attack, the jury could reasonably have found that death was a probable consequence of the attack. Having so found, the jury could reasonably infer that defendant's purpose in so attacking Kindred was to kill him.
Having found sufficient evidence to support defendant's attempted murder conviction, we turn to his contention that both his attempted murder and aggravated robbery convictions are against the manifest weight of the evidence.
In contrast to reviewing defendant's sufficiency challenge where we were required to view the evidence in a light most favorable to the state, in reviewing defendant's manifest weight claims, we sit as a '"thirteenth juror,"' reviewing the entire record, weighing the evidence and all inferences reasonably drawn therefrom, and considering the credibility of witnesses. Thompkins, supra, at 387. However, our power to grant a new trial on manifest weight grounds is discretionary and will be exercised only in the exceptional case where the evidence weighs heavily against the conviction, and it appears that the jury lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. Id.
In arguing that his convictions for attempted murder and aggravated robbery are against the weight of the evidence, defendant contends that the overwhelming evidence, that he was suffering from an alcohol induced blackout at the time of the alleged crimes, prevented the state from carrying its burden of proving that he acted with the specific intent necessary to commit either crime.
It is well established that where specific intent is an element of the crime charged, voluntary intoxication may be shown to have precluded the defendant from forming the intent necessary to commit the crime. State v. Fox (1981), 68 Ohio St.2d 53,55. Both attempted murder and aggravated robbery are specific intent crimes. Fox, supra, at syllabus; State v.Kendrick (Apr. 14, 1988), Cuyahoga App. No. 53722, unreported. Thus, the evidence of defendant's voluntary intoxication could properly be considered in determining whether he had formed the requisite intent to commit attempted murder or aggravated robbery.
Defendant testified that he consumed two shots of tequila and more than twenty beers on the night in question. He also testified that he had no memory whatsoever of attacking Kindred or taking Kindred's car. In addition, Lynn Hamilton, a Level Three Certified Chemical Dependency Counselor, testified for defendant as an expert on "alcoholic blackouts." According to Hamilton, there is no objective test for determining whether an individual has experienced an alcoholic blackout; an individual's claimed inability to recall events is the only indicator of such an event. Hamilton also testified that a person experiencing an alcoholic blackout is not aware of his actions, but may appear to be functioning normally.
While the above evidence is sufficient to have permitted the jury to find that defendant did not form the specific intent necessary to be convicted of either attempted murder or aggravated robbery, our independent review of the record reveals a reasonable basis for the jury's rejection of defendant's claim of alcoholic blackout. The evidence of defendant's alcoholic blackout was entirely dependent upon defendant's testimony, and defendant's testimony regarding his alcohol consumption was not corroborated by Jamie Pyle. Pyle's estimate of defendant's alcohol consumption on the night in question was considerably less than the amount testified to by defendant. In particular, while defendant stated that he had two shots of tequila and more than twenty beers on the night in question, Jamie Pyle testified that defendant had, at most, ten beers. Nor did Pyle confirm defendant's claim that he continued to drink after they left Kelly's bar. Finally, Pyle stated that defendant did not appear to be drunk after they left the bar that morning. Given this evidence, the jury could reasonably have concluded that defendant's testimony regarding his alcohol consumption and blackout was self-serving and lacked credibility. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus (holding that the credibility of witnesses is for the jury to determine). Thus, we cannot say that the jury lost its way and created a manifest miscarriage of justice in choosing to disbelieve defendant's claim of alcoholic blackout.
Defendant's first and second assignments of error are overruled.
In his third assignment of error, defendant argues that the trial court abused its discretion in ordering defendant to pay restitution of at least $50,000 when there was no evidence of the victim's economic loss before the court.
The amount of restitution ordered by a court must bear a reasonable relationship to the actual economic loss suffered.State v. Marbury (1995), 104 Ohio App.3d 179, 181. In the present case, the state concedes that the trial court abused its discretion in ordering an arbitrary amount of restitution instead of holding a hearing to ascertain the victim's actual economic loss. Defendant's third assignment of error is sustained.
Having overruled defendant's first and second assignments of error, but having sustained his third assignment of error, the judgment of conviction is affirmed and the judgment of sentence is reversed in part and this matter is remanded to the trial court for further proceedings pertaining to the matter of restitution.
Judgment affirmed in part and reversed in part; causeremanded with instructions.
BOWMAN and BROWN, JJ., concur.
YOUNG, J., retired, of the Tenth Appellate District, assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution.
[1] R.C. 2923.02(A) provides as follows: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense."
[2] R.C. 2903.02(A) provides in relevant part as follows: "No person shall purposely cause the death of another."